CARLISLE v. UNITED STATES.
No. 50263.

United States Court of Claims.
Dec. 1, 1953.

A. Yates Dowell, Washington, D. C., for plaintiff.

T. Haywood Brown, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., G. M. Paddack, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

PER CURIAM.

Neither party has filed any exception to the findings of fact as made by the trial commissioner. The plaintiff has filed no brief.

The findings are approved and adopted by the court.

On the basis of these findings defendant's motion for judgment is granted and the petition dismissed.

It is so ordered.

Findings of Fact

The court makes findings of fact as follows, based upon the evidence, the report of Commissioner Hayner H. Gor-

don, and the briefs and argument of counsel:

1. This is a patent suit alleging infringement of United States letters patent No. 2,365,625 issued December 19, 1944, to Vernon R. Carlisle, the plaintiff, on an application filed in the Patent Office on December 22, 1941. The patent relates to safety harnesses and its title is "Safety Device for Vehicle Passengers." The plaintiff, a citizen of the United States, owns the entire right, title and interest in the patent in suit.

A copy of the patent in suit (plaintiff's exhibit I) and a copy of the Patent Office file wrapper and contents thereof (defendant's exhibit 1), which materialized into the patent in suit, are made a part of this finding by reference.

The petition as filed included three other patents but during the pre-trial proceedings in this case and as indicated in the pre-trial memorandum of the Commissioner filed January 7, 1953, these three patents were withdrawn from the case by the plaintiff.

### State of the Art

2. Safety harnesses cover a field extending from children's gocarts to airplanes and in general consist of a retaining body harness made of straps or the like to be worn by an individual for the purpose of preventing injury by being thrown from a vehicle upon a sudden stopping or change of direction of movement of the same. As exemplified in the Meredith patent issued February 22, 1921 (defendant's exhibit 7), the illustration of which is reproduced herewith, such a body harness may consist of a pair of shoulder straps extending over the body of a child from front to rear, the front ends of these shoulder straps slidably engaging a body-encircling strap.

The entire harness is fastened to a suitable base by means of four straps.

The statement of invention as set forth in the specification is as follows:.

"Further, the invention embodies an adjustable safety harness for children which will permit free movement of the latter upon a suitable base such as a chair, go-cart, etc., and at the same time prevent the child from falling."

The United States patent to Twombly issued January 21, 1913 (defendant's exhibit 9) Fig. 1 of which is herewith reproduced, shows a safety harness for aviators which consists of a pair of shoulder straps extending from front to rear of the aviator and connected at the front with a body-encircling strap. The rear portions of the shoulder straps and body straps are connected behind the body of the aviator to the frame or fuselage of the airplane.

## The Patent in Suit

3. The patent in suit is entitled "Safety Device for Vehicle Passengers." This structure comprises a safety harness which the specification describes more particularly for the use of passengers in automobiles, although its use is not thus limited either by the specifications or the claims in suit.

As described and shown in the drawings of the patent, which are reproduced on page 887, the harness consists of a pair of shoulder straps extending up the front and over the shoulders of the wearer and having their rear ends anchored to the floor or to the body of the vehicle behind the seat. The front ends of these shoulder straps are each provided with a loop which slidably engages with a horizontal lap strap or belt. This belt extends over or across the thighs of the wearer and downwardly on each side of the seat to a snap hook engaging with an eye fastened to the floor of the vehicle. Each of the shoulder straps and the belt strap are adjustable as to length by means of an adjustable buckle connection so that they may be suitably tightened or adjusted to the body of the individual wearer.

The specification places special emphasis upon fastening the straps to the

Fig.1.

body of the vehicle instead of to the seat. The specification states:

"Also, by having all straps fastened to the floor of the car with the reinforcing washers or plates beneath the floor as in Fig. 1 a strong effective anchoring means is provided which will not pull loose. This is of great practical importance inasmuch as all previous devices fastened to the back or top of the seat so that if the force of gravity tore the seat loose in case of an accident or impact in a collision the device would fail whereas in the present instance this would not happen since the fastening means is separate or independent of the seat attachment means."

4. The claims in suit are as follows:

"4. In a safety device of the kind described for a seat for a vehicle, a pair of straps extending downwardly from the top of the seat-back at the front of the seat-back, extending over the top of the seat-back and anchored at their rear ends to the body of the vehicle, and a pair of straps anchored to the floor of

Fig. 1

Fig. 2.

the vehicle near the bottom of the seat at the sides thereof and slidably engaging with the lower front ends of the first straps and connected therebetween.

"5. In a safety device for a seat of a vehicle, a pair of straps extending downwardly from the top of the seat-back in spaced relation at the front of the seat-back, extending over the top of the seat-back and anchored at their lower rear ends to the body of the vehicle in the rear of the seat-back, and a pair of straps anchored to the floor near the front of the seat, extending upwardly and inwardly and slidably connecting with the lower front ends of the first straps and adjustably connected between the latter."

5. It has been stipulated by the parties that the device defined by claims 4 and 5 of plaintiff's patent No. 2,365,625, here sued on, was not reduced to practice prior to the constructive reduction represented by the filing of the application upon which the patent issued, said filing date being December 22, 1941.

### File History

6. The file wrapper of the patent in suit (defendant's exhibit 1) shows that when the application was filed in the Patent Office the following claims (original claims 1 and 3) were typical of the scope of the invention desired by the plaintiff:

"1. In a safety device of the kind described for a seat of a vehicle, a pair of straps extending downwardly, means for securing said straps relative to said seat, a cross strap mounted on said downwardly depending straps and adapted to extend across the front portion of a body seated in said seat.

"3. In a safety device of the kind described for a seat of a vehicle, a pair of straps extending downwardly, means for securing said straps relative to said seat, an adjustable cross strap adjustably mounted on said downwardly depending straps and adapted to extend across the front portion of a body seated in said seat."

In the first office action several prior art patents were cited by the Examiner, among them being United States patent to Tyler No. 1,368,466 issued February 15, 1921. The title of this patent was "Safety Device for Occupants of Vehicles." This patent discloses a pair of straps extending over the back of the seat and downwardly over the front edge of the seat. These straps are fastened at either end to the seat of the vehicle. A transverse strap extends between the downwardly extending straps to prevent forward tilting of the body of the seat occupant.

For convenience, Fig. 1 of this patent is reproduced herewith.

7. In an amendment of August 21, 1942, the plaintiff through his attorney and referring to the shoulder straps, stated—

"In the preferred form they are anchored to the floor, as shown in Fig. 5 or to the body of the vehicle as shown in Fig. 6. The vertical straps are made in two sections, which are adjustable in length and anchored to the floor while adjustable cross straps are disposed between the vertical straps. In the form shown in Fig. 1, the cross straps have loops 26 and 28 to receive the straps 17, but in the form shown in Figs. 5 and 6, the adjustable straps 17a are also made in two sections and have loops 35 receiving the adjustable cross strap which is in the form of an inverted U, and anchored at its extremities to the floor. The patents cited do not appear to show this structure."

The present claims in suit, 4 and 5, as filed in the Patent Office by the plaintiff in an amendment of July 5, 1943, were phrased in substantially their present form which contains the limitation that the straps are anchored to the body of the vehicle and to the floor thereof.

The Alleged Infringing Structure

8. Within a period of six years preceding the filing of the petition in this case safety harnesses for airplanes have been manufactured and used for or by the defendant without the consent of the plaintiff. The structural details of such harnesses are shown in a set of drawings identified as follows:

"Drawing 51 H 3977 as plaintiff's exhibit II

Drawing 44 G 5443 as plaintiff's exhibit III

Drawing 50 D 3770 as plaintiff's exhibit IV

Drawing 50 D 3771 as plaintiff's exhibit V

Drawing 50 D 3772 as plaintiff's exhibit VI

Drawing 44 G 5437 as plaintiff's exhibit VII

Drawing 49 D 7079 as plaintiff's exhibit VIII"

Safety harness shown in the drawings is further exemplified by a physical exhibit, in evidence as defendant's exhibit 34, this exhibit more particularly embodying the forms of belt structure shown in drawings, plaintiff's exhibits IV and VII.

9. The alleged infringing Government structure illustrated by defendant's exhibit 34 consists of two portions. The first is a shoulder harness consisting of two flat straps of webbing extending upwardly in front of the aviator, one strap extending over each shoulder. The rear ends of these straps are merged or stitched together into a single strap which extends down the back of the aviator's seat. The end of this single strap is provided with a metal fitting which is secured to some fixed portion of the seat. The seat is structurally secured in the airplane.

The other portion of the Government structure consists of a lap belt, the outer ends of which are secured one on each of the opposite sides of the seat by bolts of the type shown in plaintiff's exhibit VII. The inner ends of each section of the lap belt are attached to a centrally located quick-release buckle. One part of this buckle consists of an elongated metal tongue. The other portion consists of a frictionally-held hook which engages with the metal tongue. This latter portion has a release lever which, when pulled upwardly, disengages the hook from the tongue and thereby releases the two portions of the seat belt from each other. Each end of the lap belt is provided with an adjustable fitting by means of which the lap belt can be lengthened or shortened to suitably conform to the body of the pilot. The shoulder straps are also provided with similar fittings to lengthen or shorten them for the same purpose.

Each of the lower outer ends of the shoulder straps is provided with a flexible loop portion. These two loops are of such a size and character as to slidably fit over the metal tongue portion of the quick-release mechanism.

If it becomes necessary for the pilot to abandon the airplane he pulls up on the release lever of the disengaging means for the seat belt. This in turn releases the metal tongue, thus unfastening the seat belt and permitting the loops of the shoulder harness to slide off the metal tongue, thereby entirely releasing the pilot from the safety harness.

### Prior Art and Knowledge

10. In addition to the prior art described in finding 2, the following patents, publications and structures were available to those skilled in the art prior to December 22, 1941, the filing date of the patent application which matured into the patent in suit:

"United States patent to Lethern No. 1,898,090 issued February 21, 1933 (defendant's exhibit 2).

"United States patent to Scott No. 1,378,382 issued May 17, 1921 (defendant's exhibit 6).

"United States patent to Smith No. 2,192,109 issued February 27, 1940 (defendant's exhibit 4).

"Abandoned patent application, Serial No. 275,102, of Floyd Smith, filed May 22, 1939, and referred to in above patent No. 2,192,109 (defendant's exhibit 10).

"Pages 429–430 of a publication entitled "Flight", issue of May 13, 1932 (defendant's exhibit 11).

"Page 850 of a publication entitled 'The Airplane', issue of May 11, 1932 (defendant's exhibit 12).

"Two airplanes known, respectively, as the Spad XIII and Fokker D–VII are on display in the National Air Museum of the Smithsonian Institution, Washington, D. C., and have been so displayed and available for public inspection since July 1919. These planes are further identified as accessions Nos. 307722 and 307726 of the Smithsonian Institution.

"A set of photographs (defendant's exhibits 16–21, inclusive) shows the above-mentioned Spad XIII and its safety harness, and a photograph (defendant's exhibit 22) shows the Fokker D–VII and its safety harness."

See also—

"United States patent to Manson No. 2,275,450 issued March 10, 1942 (defendant's exhibit 5) on an application filed in the Patent Office June 25, 1940, this filing date being approximately a year and a half prior to the filing of the application which matured into the patent in suit." [1]

11. United States patent to Lethern (defendant's exhibit 2) discloses a safety harness, the basic elements of which are a lap strap and a shoulder harness. The lap strap consists of straps passing over and around the pilot's thighs, the ends thereof being secured to the airplane floor on each side of and adjacent the seat by means of anchors or hooks as indicated in Fig. 7, which is reproduced on page 891. The shoulder straps, which are to prevent the pilot's pitching forward in his seat, consist of two individual straps joined together at their rear ends back of the seat and fastened by means of hooks to the body of the plane. These straps extend over the shoulders

---

1. This patent is evidence of invention at its date of application for all matter disclosed. (See Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651.

of the pilot, and in the modification shown in Fig. 7 extend downwardly to engage the lap straps at the central portion thereof. This engagement, as stated in the specification, is permanent.

12. United States patent to Scott (defendant's exhibit 6) has reference to a parachute harness which consists of shoulder straps extending from a rear parachute pack over the shoulders of the pilot and down to a waist belt which passes through loops in the lower front ends of the shoulder straps.

The specification points out that the object of the invention is to provide a parachute and pack adapted to be attached to and carried solely on the body of the user, the device being entirely separate from and unattached to the airplane or balloon. Such a device has neither the function nor use of the safety harness structure in issue.

FIG. 7.

13. United States patent to Smith (defendant's exhibit 4) discloses a safety harness, Fig. 2, which is reproduced herewith, showing various details thereof when detached from the chair or pilot's seat. This safety harness includes the two basic elements, namely, a pair of shoulder straps which converge together at their rear ends where they may be fastened to the rear of the pilot's chair. These shoulder straps extend upwardly over the back of the chair, across the shoulders of the pilot, and down to a quick-release element located at the center of the lap belt portion of the harness.

The quick-release device consists of a stud carried at the inner end of the left-hand lap belt, which stud is adapted to receive fastener apertures located at the end of the right-hand end of the seat belt and on the ends of each of the shoulder straps. After these coupling fasteners have been slipped over the stud, a pin 170 holds them in place. A pull on this pin releases all of the fastener fittings on the stud and thus permits the simultaneous unfastening of the shoulder straps and the seat belt.

14. The two publications (defendant's exhibits 11 and 12) are directed to illustrated description of what is known as the Irvin Safety Belt Harness. The description given in each of these articles points out that the harness is connected to the cockpit of the airplane at three points, one behind the pilot's shoulders and one on the floor at each side of the pilot's seat. An alternative form of connection is mentioned in which it is said that the side connections if desired may be made directly to the seat. None of the details of the harness connections are clearly shown but it appears from the articles that the harness includes a pair of shoulder straps passing over the shoulders of the pilot.

FIG. 2.

15. The Spad XIII airplane, which has been on exhibition at the Smithsonian Institution, Washington, D. C., since July 1919, was provided with a safety harness which is best illustrated in the photograph of the same (defendant's exhibit 21). This consisted essentially of a strap attached intermediate its length to the body of the plane in the cockpit by a retaining device seen in the lower left-hand corner of the photograph (defendant's exhibit 21). This strap extended through a slot in the side of the seat which was secured in the cockpit. One end of the strap, namely the leg strap, passed upwardly to the front of the wearer's body and was attached there to a circular quick-release device. The other end of the strap passed upwardly behind the wearer and over the shoulder and then downwardly for attachment to the quick-release device. This construction was repeated on the other side of the seat. A cross strap connected the two back portions of the harness which consisted of a lap strap or straps and a pair of shoulder straps, all of which were connected to the quick-release device.

The safety harness associated with the Fokker D–VII was of similar character but in this instance the shoulder straps passed upwardly in front of the wearer's body, over the shoulders, and were secured at the rear ends to a transverse bar independent of the seat and extending between the sides of the fuselage. This structure is shown in a photograph (defendant's exhibit 22).

Temple N. Joyce, pilot and aircraft manufacturer, Court Square Building, Baltimore 2, Maryland, and Reed M. Chambers, president of United States Aviation Underwriters, 80 John Street, New York 7, New York, and E. V. Rickenbacker, president of Eastern Air Lines, 10 Rockefeller Plaza, New York City, flew both the Spad and the Fokker type planes above referred to and used safety harnesses of the same construction as those displayed in these planes at the Smithsonian, during the period of United States participation in World War I and during a period of several years thereafter in this country. The same type planes and harnesses were used by Alford J. Williams, aviator, at McCook Field, Dayton, Ohio, in or about the years 1921–1922.

16. United States patent to Manson (defendant's exhibit 5) discloses a safety harness similar in construction, function and operation to the defendant's accused structure as exemplified by defendant's exhibit 34. Figs. 1 and 5 of this patent

are reproduced. Fig. 1 shows a pair of shoulder straps extending upwardly from the waist of the wearer, across his shoulders, and across the back of the seat and converging into a single strap which extends downwardly under the pilot's seat, where it may be adjustably fastened to the seat by the link chain extension which extends forwardly under the seat into a convenient location, to be manipulated by the pilot. This link chain adjustable feature, by means of which the pilot can reach under the forward edge of the seat and adjust the tension on the shoulder straps, is the only variation from the Government structure shown by defendant's exhibit 34.

The lap belt consists of two portions, the outer ends of which are secured one on each of the opposite sides of the seat at the rear thereof. The inner ends of each section of the lap belt are attached to a centrally located quick-release buckle. Each section of the lap belt is provided with a length-adjusting buckle so that the belt can be adjusted to suitably conform to the body of the wearer. The quick-release buckle consists of an elongated metal tongue fastened to one of the lap belt portions, which tongue engages with a frictionally-held hook fastened to the other portion of the lap belt. A release lever, when pulled upwardly, disengages the hook from the tongue and thereby releases the two portions of the seat belt from each other.

The two front ends of the shoulder straps are each provided with a loop, which loops provide an attaching means for the shoulder straps to the lap belt by slipping the loops over the elongated tongue prior to fastening the quick-release mechanism.

Fig. 1.

When the quick-release mechanism is unfastened the portions of the seat belt separate and the loops on the ends of the shoulder straps slip off the elongated tongue, thereby entirely freeing the pilot from the safety harness. Fig. 5 of the patent illustrates the opening of the seat belt and the disengagement of the two loops of the shoulder straps from the elongated tongue.

### Infringement and Validity

17. For convenience in considering the phraseology of claims 4 and 5 in suit they are paraphrased as follows, the crucial portions of the claims being italicized:

*"Claim 4*

"(a) In a safety device of the kind described for a seat for a vehicle,

"(b) a pair of straps extending downwardly from the top of the seat-back at the front of the seat-back, extending over the top of the seat-back *and anchored at their rear ends to the body of the vehicle,* and

"(c) a pair of straps *anchored to the floor of the vehicle near the bottom of the seat at the sides thereof* and slidably engaging with the lower front ends of the first straps and connected therebetween.

*"Claim 5*

"(a) In a safety device for a seat of a vehicle,

"(b) a pair of straps extending downwardly from the top of the seat-back in spaced relation at the front of the seat-back, extending over the top of the seat-back and *anchored at their lower rear ends to the body of the vehicle in the rear of the seat-back,* and

"(c) a pair of straps *anchored to the floor near the front of the seat,* extending upwardly and inwardly and slidably connecting with the lower front ends of the first straps and

"(d) *adjustably connected between* the latter."

_Fig.5_

18. As indicated in findings 6 and 7, the limitations as to the method of anchoring the ends of the shoulder straps and the lap straps to the vehicle body were introduced during the prosecution of the patent in suit in the Patent Office. The specification of the patent emphasizes the advantages of such specific connections.

In the accused structure the ends of these straps are fastened to the seat as distinguished from the floor or body of the vehicle. To stretch the phraseology of claims 4 and 5 to cover connections of the straps to the seat would be contrary to the limitations incorporated in the claims, the patent specification and the file wrapper history of the application which materialized into the patent in suit.

Claim 5 is further limited to an adjustable connection between the two portions of the lap strap and the slidable connections at the lower ends of the shoulder straps. The accused structure differs in that the adjustable connections for the lap straps are not located between the connections of the shoulder straps with the lap strap. These adjustable connections, of which there are two in the accused structure, are located approximately midway of each lap strap portion, i. e., between the seat connection and the quick-release mechanism which hooks together the two portions of the lap strap at the point where the shoulder straps engage the same.

The Manson patent (see finding 16) is substantially identical to the accused structure. If the claims in suit were given a sufficiently broad scope to read upon the accused structure they would read with equal facility upon the Manson patent, and therefore be invalid.

19. Claims 4 and 5 of the patent in suit are not infringed.

20. The parties have agreed that the questions of validity and infringement of the alleged invention by the United States be first determined upon full proofs, argument of counsel, and findings of fact.